VICTOR A. PYLES COMPANY, INC. ET AL. *v.*
DOROTHY M. REHMANN ET VIR, ET AL.

[No. 923, September Term, 1973.]

*Decided June 21, 1974.*

The cause was argued before MORTON, MENCHINE and LOWE, JJ.

*Donald L. Merriman* and *James L. Mann, Jr.,* with whom were *Merriman, Crowther & Merriman* on the brief, for appellants.

*Richard R. Beauchemin,* with whom were *Arnold, Beauchemin & Huber,* P.A. on the brief, for appellees.

LOWE, J., delivered the opinion of the Court.

Dorothy M. Rehmann and her husband (hereafter collectively referred to as "Rehmann") sued Victor A. Pyles Company, Inc. and Terry A. Strother (hereafter collectively referred to as "Pyles") who in turn brought a third party action against Richard L. Given and Chemical Leamon Tank Lines, Inc. (hereafter collectively referred to as "Given"). Rehmann did not choose to amend so as to proceed against Given. Md. Rule 315 d 1.

The case was tried before a jury of the Circuit Court for Baltimore County. At the conclusion of the trial, the trial judge directed a verdict in favor of Rehmann against Pyles and also directed a verdict in favor of Pyles against Given. The case went to the jury solely on the issue of damages. A verdict totalling $12,500 was returned.

Motions for Judgment N.O.V. were filed by Rehmann and Pyles. Rehmann's motion which applied only to the third party claim was granted,[1] and a judgment was entered in favor of Given. Pyles' motion was denied. Pyles appealed from all judgments.

---

\* Note: *Certiorari* denied, Court of Appeals of Maryland, September 11, 1974.

1. Md. Rule 315 e 1 provides that "Any" party may move for a dismissal of a third party claim. Presumably the court below treated a motion for judgment n.o.v. as a motion for dismissal. Since the issue was not raised, we do not reach the question of the right of the original plaintiff to exert

The facts are disarmingly simple and the solutions would be little more difficult but for the ominous presence of the "pariah" [2] who enters a favored highway at his peril and is negligent as a matter of law in so doing, *i.e.*, a driver who violates the "Boulevard Rule."

Mrs. Rehmann was driving a 1959 Dodge west on U. S. Route #40 in the right hand lane. She was approaching an intersection where she anticipated turning right off the boulevard into the Pike Plaza Shopping Center where she worked. The total absence of negligence on her part throughout is uncontested and the judge below so instructed.

Following her was Richard L. Given operating a tank type tractor trailer truck (owned by Chemical Leamon Tank Lines, Inc.) in which a relief driver was sleeping on a bunk in the cab behind Given. Westbound traffic at this point on Route #40 proceeded upon a downgrade approaching the Shopping Center intersection which was controlled by a traffic signal.

Parked on the right hand shoulder of Route #40, immediately to the east of the entrance to the Shopping

prerogatives of a third party defendant not impleaded by the plaintiff in the original suit by amendment or otherwise.

Rehmann's successful attempt to obtain the judgment n.o.v. on behalf of Given was motivated by Given's having settled with Rehmann for $19,000. Given obtained a release under the Uniform Contribution Among Joint-Tort Feasors Act contained in Article 50 of the Maryland Code. Once Given was held not to be a joint-tort feasor, Pyles became the lone tort-feasor, solely liable for the judgment and the settlement by Given became a windfall to Rehmann. Since there was no joint tort-feasor there would be no diminution (or abolition) of the $12,500 damages awarded by the jury pursuant to § 19 of the Uniform Act, Md. Code, Art. 50, which reads:

"§ 19. Effect of release on injured person's claim.

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid. (An. Code, 1951, § 23; 1941, ch. 344, § 24.)"

2. "Rigorous as are the duties imposed upon the unfavored driver in entering the public highway for the protection of the public and for the smooth flow of traffic, he is not a perpetual *pariah*; if he has observed the mandates of the law in entering the intersection and has become a part of the flow of traffic on the favored highway, he has the same rights and is subject to the same duties as the other drivers on that highway." Grue v. Collins, 237 Md. 150, 157. (Emphasis added.)

Center, was Appellant Pyles' "low boy" trailer truck used to transport construction equipment. Pyles' employees were attempting to mount a front-end loader[3] on the low boy. The loader was to be driven up a ramp on the right side of the low boy onto the bed of that truck perpendicularly. Upon arrival it would have been turned parallel with and secured for hauling upon the low boy truck's body.

The front-end loader crawled up the ramp to the bed of the low boy as Mrs. Rehmann's car was opposite the loading operation. Given was some twenty feet behind. As the front-end loader "dropped" or settled in place on the truck bed, its blade or bucket projected " . . . two or three feet . . . ." into the traveled portion of the highway.

The evidence indicates that Mrs. Rehmann veered slightly to the left, apparently taking evasive action upon seeing the dozer's approach but before it protruded over the highway. She immediately turned back to the right to enter the Shopping Center entrance located just feet beyond the low boy. More significantly the protrusion of the loader blade into the roadway coincided with the arrival of the cab of Given's tractor trailer. Given "caught a glimpse of" the blade from the "right-hand corner of [his] windshield." He too then veered as far to the left as he could considering heavy traffic in the next lane, all the while peripherally watching through his right hand mirror, anticipating contact between the blade and the trailer of his truck. No contact was made, however, and " . . . just a few feet later [Given] caught the left-hand taillight of the car in front . . . ." It was the Rehmann vehicle with which he collided. Mrs. Rehmann had nearly completed her turn into the Shopping Center but her fin-like fender projecting a taillight was struck by the right headlight of the truck. Given admitted anticipating Mrs. Rehmann's "turn off to the right"[4] at the intersection and

---

3. This vehicle is alternatively referred to throughout the testimony as a bulldozer and blade or as a front-end loader and bucket, because of their similar appearance and structure. The vehicle moves on caterpillar tracks. The bucket or blade is carried in front by arms which raise or lower the bucket or blade. Its primary purpose is to move or load earth.

4. " 'Question: Were you aware that that is where she would have made her right turn? Answer: Yes, that was my understanding, she would make

acknowledged that he had not applied his brakes before impact for fear of "jackknifing" the tractor trailer or for fear that someone would "hit me in the rear" on the heavily traveled road.

He had seen Mrs. Rehmann's right turn signal for "fifty yards back from the point that she would actually physically make the turn." Given was decelerating as he followed 15 to 20 feet behind her at a speed of 15 to 20 miles per hour.

Given's negligence appeared so "glaring" in the first instance as to compel the trial judge to find him negligent as a matter of law, as he had done with Pyles as well. However, after reading the recently reported *Tippett v. Quade,* 19 Md. App. 49, the judge reversed his decision saying "I am persuaded I was in error when I directed a verdict in favor of Pyles and Strother against Given and Chemical, and as to that the Plaintiffs' motion [for judgment n.o.v. on behalf of Given] will be granted." [5]

— The Entrance —

The first issue we must determine is whether or not the

---

a right turn there unless she just had her blinker on and didn't know it. Question: The emphasis is where she would have made the turn. Were you aware that just in front of the flatbed was the intersection at which she would turn? Answer: In my mind, yes, because I had planned for her to make the right turn there. I had anticipated her making a right turn into the intersection at that point. Question: You were anticipating then she was likely to slow down in making the turn? Answer: Right.' "

5. The trial judge apparently referred in part to that portion of Tippett which states "In the instant case, the appellee represents a third party, the deceased passenger, and not one of the two drivers involved in the accident. That makes no difference. The principles which surround application of the 'boulevard rule' are the same in such a case as those to which the court would look if the suit were one involving a favored driver and an unfavored driver alone." Tippett v. Quade, *supra*, 59, citing as examples supporting that premise, Harper v. Higgs, 225 Md. 24 and Shedlock v. Marshall, 186 Md. 218. Both cases deal with actions by guests in one of the vehicles against both the favored and unfavored vehicles. However, in each case the Court of Appeals permitted both the favored and unfavored vehicles' negligence to be determined by the jury.

The quoted statement was not intended to preclude the right of recovery by an innocent third party against multiple tort-feasors notwithstanding the fact that one had violated the Boulevard Rule. We are not faced with that question here. The original Plaintiffs Rehmann sued Pyles only, having settled to their satisfaction against Given. Although Rehmann's pecuniary recompense could be affected, by virtue of the joint tort-feasor release, *see* Md. Code, Art. 50, § 19, the causation dispute is between Pyles as a third party plaintiff and Given as a third party defendant.

appellant, Pyles, did indeed violate the Boulevard Rule. In opposing such a finding, appellant argues that two physical factors are necessary for the application of the rule. He contends first that the intrusion upon the favored highway must be at " . . . an *intersection* of a favored highway and an unfavored street . . . ." (Emphasis added.) Appellant cites *Oddis v. Green,* 11 Md. App. 153 and *"Bothersome Boulevards,"* by John W. T. Webb, 26 Md. L. Rev. 111, 112. We do not read either in the perspective cited by appellant. The existence of an intersecting street is not a condition to recovery but rather an indicium of whether the road in question is a "boulevard." Appellant had not questioned the trial court's finding that Route #40, the scene of this accident, is a "boulevard," and once we have made that determination, the Court of Appeals has emphatically removed " . . . all doubts about the rule's application and discourage[d] the belief that there are other exceptions not already recognized by our case law." *Creaser v. Owens,* 267 Md. 238, 240-241. We find no exception indicating impunity for those who enter or cross a boulevard from fields or other curbs where no roadway intersects.

It is inconceivable that a rule which has as its primary purpose to expedite the movement of traffic on designated highways, and its concomitant purpose to assure the safety of drivers of motor vehicles, could be interpreted to expedite traffic only at intersections and to protect motorists only at cross roads, but not between them. See *Cooper v. Allen,* 243 Md. 9, 12. The statutory authority for the rule does not refer to *intersections* when it admonishes motorists to stop and yield, but rather uses the more generic term "entrance." [6] It reads:

> "The driver of a vehicle shall come to a full stop as required by this subtitle at the entrance to a

---

6. "entrance . . . 1. The act or an instance of entering.
    2. Any passage or opening that affords entry . . . ."
   "enter . . . 1. To come or go into.
    2. To penetrate; pierce . . . ."

*The American Heritage Dictionary of the English Language.*

through highway and shall yield the right-of-way to other vehicles approaching on the through highway." Md. Code, Art. 66¹/₂, § 11-403 (b).[7]

It is incomprehensible that the Court of Appeals would apply this rigid doctrine to the driver of a farm rig from a farm lane, see *Shriner v. Mullhausen*, 210 Md. 104, and not intend it to apply to the driver of a front-end loader entering perpendicularly from the side of a highway.

— The Collision —

The second prong of appellant's argument posits as one of the two conditions precedent to the applicability of the boulevard rule that, " . . . there must be a collision occurring as a direct consequence of the entrance of the unfavored vehicle onto the favored highway in disregard of its obligation to yield." Again we find appellant's authority of *Oddis v. Green, supra,* inapposite and *"Bothersome Boulevards," supra,* to the contrary. Mr. Webb states at page 120 of his article, "It is not necessary for there to be impact between the favored and unfavored vehicles."

More compelling to us, however, is the case of *Dunnill v. Bloomberg,* 228 Md. 230, in which the Court of Appeals stated:

> "Nor does the fact that the two vehicles did not collide seem of any moment. The defendant's encroachment on the favored highway (even if it was more or less creeping) confronted the plaintiff with an emergency. He could not be sure that the plaintiff would stop; it seemed highly probable, to say the least, that a collision would occur if he failed to and if the plaintiff held his course. His swerve to the right when faced with the emergency situation was a perfectly natural, reflex movement caused by the defendant's negligence, and it

---

7. This portion of the "Boulevard Rule" was formerly found in Art. 66 ¹/₂, § 233 (a) of the Md. Code. (*See* 1967 Replacement Volume.) The only change effected by the revision of 1970 (ch. 534) was to substitute the word "subtitle" in § 11-403 (b) for the word "article" in old § 233 (a).

involved no contributory negligence attributable to him. *Burhans v. Burhans*, 159 Md. 370, 150 A. 795; *Coastal Tank Lines v. Carroll*, 205 Md. 137, 106 A. 2d 98. The swerve so caused was unquestionably the cause of the plaintiff's striking the curb. Here again we assume that the defendant stopped, as he said, a foot short of the center of the street, dividing the north and southbound lanes and that he did not actually enter a southbound lane. An exceedingly nice calculation of speed, time and distance would have been required of the plaintiff to determine that the defendant would stop and that he, the plaintiff, could safely continue without swerving. To require such calculations would be directly contra to the often repeated policy of the boulevard rule to avoid them and would inevitably conflict with its other frequently declared purpose to expedite traffic on through highways.

"On the uncontroverted evidence (*cf. Smith v. Bernfeld*, 226 Md. 400, 405, 174 A. 2d 53), we conclude that the plaintiff was entitled to a directed verdict in his favor on the issues of the defendant's negligence and of his own freedom from contributory negligence. That would have settled the issue of liability leaving open only the question of damages." *Dunnill v. Bloomberg, supra*, 235-236.

The evidence was uncontradicted that the bucket of the front-end loader encroached upon the travelled portion of the highway.[8] The trial judge was correct in finding that the boulevard rule was applicable and having so found was equally correct in holding the "unfavored driver . . . negligent as a matter of law . . . ." *Creaser v. Owens, supra*, 244.

---

8. Given's testimony that the bucket projected " . . . two or three feet" into the travelled portion of the road was not disputed by the operator who testified that the bucket "could have" projected over the road but if it did so it was not to his knowledge.

— The Proximate Cause —

We see a significant analogy between *Dunnill* and the case at bar, and this brings us to the next question to be answered, *i.e.*, Given's negligence. Before the question of whether there was negligence on the part of a favored driver contributing to an accident can be submitted to a jury (let alone be directed), such negligence must have been the proximate cause of the accident. *Harper v. Higgs* and *Shedlock v. Marshall*, both *supra*. The limited cases in which the Court of Appeals has found the favored driver's negligence to amount to the "proximate cause" sufficient to provide a jury question, have been those in which the favored driver " . . . was completely inattentive to what was ahead in the road . . .," see *Harper v. Higgs, supra*, and, but for such heedlessness, the accident might have been averted. To support a contention that the insouciance of the favored driver was so extreme as to avoid the rigidity of the Boulevard Rule, there must be "positive evidence of such inattention or lack of due care . . .," *Tippett v. Quade, supra*, 61, or a showing that the favored driver otherwise would have been able to avoid the accident. *Cf. Zeamer v. Reeves*, 225 Md. 535; *Harper v. Higgs, supra*. Stated less equivocally, " . . . if the unfavored driver is a plaintiff, his suit is defeated unless the doctrine of last clear chance rescues his claim." *Creaser v. Owens, supra*, 245.

The record reveals nothing to indicate Given's complete inattention, but for which he could have avoided the accident. As in *Coastal Tank Lines, Inc. v. Carroll*, 205 Md. 137, the favored driver was "confronted with a sudden emergency, not of his own making . . . ." caused in this case by the intrusion of the bucket or blade upon the travelled portion of the highway. Given's attentiveness to the circumstances ahead prior to the sudden intrusion is attested by his candid acknowledgment that he saw Mrs. Rehmann's turn signal, the intersection and the traffic control; and that he expected her anticipated turn " . . . in a couple hundred feet." His necessarily sudden decision to swerve to the left was occasioned partly out of fear that the blade or bucket would strike the cab of his truck where the

relief driver's head was lying during his repose.[9] He swerved as far to the left as traffic would permit in avoiding the protruding blade. He explained that he did not brake suddenly out of fear of jackknifing the empty trailer on the crowded highway or of being struck in the rear by traffic following. While those facts in themselves seem sufficient to excuse an emergency decision, the physical evidence showed in addition that to stop suddenly would have left him in the path of the oncoming loader.

---

**9.** "Q Tell us what effect that had on you at that moment and what, if any, evasive action you took?

"THE COURT: Tell us what happened, not what effect it had on you. What did you do?

"THE WITNESS: I went as far into the left-hand lane as I possibly could, I couldn't physically go into the left-hand lane because it was just full of traffic, but I eased over as close to them as I possibly could, and tried to keep the bulldozer blade in sight with my mirror. Of course, I was just waiting for it to hit.

"THE COURT: Did you come into contact with any part of the low-boy or the bulldozer?

"THE WITNESS: No, sir.

"Q (BY MR. BEAUCHEMIN) Mr. Given, when you say you moved over, was this a sudden movement?

"A Yes, sir. I was quite sure that I would make contact at the right corner of my tractor, or the right, not windshield area, right windshield, in that area, and of course the sleeper was right behind me, and of course in almost all sleeper cab operations the relief driver sleeps with his head that way.

"Q Were you concerned about him?

"A Yes, sir. I just really was waiting for the noise, then the rest —

"Q If you had not swerved your low-boy at that point would you have come into contact with that blade?

"A I imagine my cab would have come in contact with it, sir.

"Q That is what I meant. Then what happened?

"A Well, at the time I was of course looking up and watching the bulldozer's blade, like that, and I'd gone as far to the left-hand side as I possibly could, and of course the car in front of me had been signaling for a right turn after that time, and I was watching that bulldozer's blade, just a few feet later I caught the left-hand taillight of the car in front of me.

"Q From the moment that you made your swerve and you saw that blade coming over on you to the moment you collided with the rear of the car in front of you, how much time elapsed?

"A It was just a matter of seconds, sir, it was right then, I mean, it was all I could do to just hang onto it right then."

By the time his tractor trailer cleared the bucket he was beyond the low boy which was parked only two feet from the intersection where the impact with Mrs. Rehmann occurred. Although he admitted not having "shut down" his rig by emergency braking, that is part of the judgment he had to make in the face of an emergency, and we cannot say in retrospect that his decision was the wrong one:

> "Perhaps perfection in anticipation, reactions and actions could have devised a means whereby the accident would have been avoided, but the driver of the Coastal vehicle is not to be tested by such a standard, but rather by what an ordinary man would do under the same circumstances. We think that the driver's actions, in the face of this sudden emergency, which he was not bound to anticipate, were comparable, in effect, to those of the driver in *Burhans v. Burhans*, 159 Md. 370, where no liability was imposed, and that the steps he took were reasonable under the circumstances to avoid the danger presented." *Coastal Tank Lines v. Carroll, supra*, 148.

The circumstances of this case are certainly not such as to fit any exceptions we find already recognized by our case law and with " . . . all doubts about the rule's application . . . " having been removed by *Creaser v. Owens*, we are, as admonished, " . . . discourage[d from] the belief that there were other exceptions not already recognized by our case law." *Creaser v. Owens, supra*, 240-241.

"Only in rare circumstances is the contributory negligence of a favored driver as a plaintiff subject to scrutiny by the fact finder and probably even rarer is submission of the question of recovery by an unfavored driver as plaintiff properly submitted to a jury under the doctrine of last clear chance." *Creaser v. Owens, supra*, 240. The record as to Given reflects nothing so compellingly negligent as to permit his judgment in an emergency created by appellants to be weighed by fact finders on the scales of neglect.

As a result of our affirming the decision of the trial court,

the question of what contribution is called for from a released joint tort-feasor whose settlement exceeded the verdict becomes moot. That release viewed in retrospect is comparable to an insurance policy which was purchased for protection subsequently found not to have been needed. Viewed by those having the advantage of hindsight, the premium for pretrial peace of mind might seem rather high.

*Judgments affirmed; costs to be paid by appellants.*